JT Russell & Sons, Inc. v. Russell, 2025 NCBC 7.

STATE OF NORTH CAROLINA

STANLY COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
23CVS000363-830

JT RUSSELL AND SONS, INC.,

        Plaintiff,

v.

ATLAS JAMES RUSSELL and THE
TILLERY TRADITION, INC.,

        Defendants.

_____

ATLAS JAMES RUSSELL,
individually and derivatively on
behalf of JT RUSSELL AND SONS,
INC.,

        Counterclaim
        Plaintiff,

v.

JT RUSSELL AND SONS, INC.;
ROBERT E. RUSSELL; RAYMOND
RUSSELL; and TONY W. RUSSELL,

        Counterclaim
        Defendants.

**ORDER AND OPINION
ON MOTION TO DISMISS
AND MOTION TO STRIKE**

1. This case arises from disputes among the shareholders of JT Russell and Sons, Inc., a closely held corporation. JT Russell has moved to dismiss derivative counterclaims asserted by Atlas James ("Jim") Russell based on an independent, court-appointed panel's determination that pursuit of the counterclaims is not in the company's best interest. JT Russell has also moved to dismiss Jim's direct counterclaim for removal of directors and to strike certain allegations in his pleading. For the reasons discussed below, the Court **GRANTS** the motion to dismiss the

derivative counterclaims, **DENIES** the motion to dismiss the claim for removal of directors, and **DENIES** the motion to strike.

> *Troutman Pepper Locke LLP, by William C. Mayberry, Daniel Prichard, William J. Farley, III, Jacquelyn Arnold, and Anna Yarbrough, for Plaintiff JT Russell & Sons, Inc.*
>
> *Bell, Davis & Pitt, P.A., by Edward B. Davis, for Counterclaim Defendants Robert E. Russell, Raymond Russell, and Tony W. Russell.*
>
> *Ellis & Winters LLP, by Pamela S. Duffy and Tyler Jameson, for Defendant Atlas James Russell.*
>
> *Fox Rothschild LLP, by Ashley Barton Chandler and Neale T. Johnson, for Defendant The Tillery Tradition, Inc.*
>
> *Bishop, Dulaney, Joyner & Abner, P.A., by Anthony Todd Capitano, for Special Nonparty David Dove.*

Conrad, Judge.

I.
BACKGROUND

2. JT Russell has been in the asphalt and road construction business for nearly sixty years. Its shareholders hail from two branches of the Russell family. Jim and his four siblings own fifty percent of the company. Jim's uncle Bob and cousins Raymond and Tony own the remaining fifty percent. By all accounts, the two sides of the family shared power for the past few decades. Each had an equal number of seats on the board of directors; Jim served as secretary and treasurer; and Bob served as president, followed by Raymond. But the balance of power shifted in 2018 when Bob's branch of the family gained majority control of the board and ousted Jim from his positions as officer and director. (*See* Compl. ¶¶ 3, 24, ECF No. 3; 2d Am. Countercl. ¶¶ 1, 3, 17, 19, 21–23, 33, 34, ECF No. 109.)

3.    This litigation began in 2023 when JT Russell sued Jim and two companies that he partly owns, one called The Tillery Tradition, Inc. and the other called Mid-Eastern Asphalt, LLC.  JT Russell claims that Jim improperly used his official positions to divert its assets to himself, his son, and his other commercial interests. (*See, e.g.*, Compl. ¶¶ 1, 6–13.)

4.    Jim counterclaimed, challenging the validity of the board shakeup and alleging that Bob, Raymond, and Tony are misusing JT Russell's assets.  In their original form, the counterclaims included claims for dissolution of JT Russell, removal of Raymond and Tony as directors, and an accounting of the allegedly misused assets.  The counterclaims also included derivative claims on JT Russell's behalf against Bob, Raymond, and Tony for breach of fiduciary duty, constructive fraud, conversion, and unjust enrichment. (*See generally* Ans. & Countercl., ECF No. 26; Am. Ans. & Am. Countercl., ECF No. 53.)

5.    In an earlier order, the Court dismissed Jim's derivative counterclaims for lack of standing.  By statute, "[n]o shareholder may commence a derivative proceeding" without having first made a "written demand . . . upon the corporation to take suitable action."  N.C.G.S. § 55-7-42.  Because Jim had not made a proper demand, he lacked standing to pursue derivative claims on JT Russell's behalf.  The Court therefore dismissed the derivative claims without prejudice. *See JT Russell & Sons, Inc. v. Russell*, 2024 NCBC LEXIS 37, at *8 (N.C. Super. Ct. Feb. 28, 2024).

6.    Jim immediately took steps to reintroduce the derivative claims.  He began by making a written demand on JT Russell as required by section 55-7-42.  In that

demand, he asserted that Bob had used JT Russell's "materials, equipment, and employee labor" to maintain his commercial farm without disclosing or documenting the use and that Raymond had told employees to cover it up by charging the work to other customers' jobs. Jim went on to allege that Raymond and Tony routinely gave themselves and their children "perks" (such as using company resources to build, heat, and improve their homes) and were mismanaging JT Russell (such as paying Bob a salary even though he "hardly does any work"). After laying out these allegations, Jim demanded that JT Russell investigate, recover Bob's salary, and sue Bob, Raymond, and Tony for damages. (Demand Letter, ECF No. 90.1.)

7. After receiving Jim's demand, JT Russell's board of directors unanimously approved the formation of an independent panel to conduct an inquiry. JT Russell then filed a motion asking the Court to appoint the panel and authorize it "to make a determination whether the maintenance of the derivative proceeding is in the best interest of the corporation," as stated in N.C.G.S. § 55-7-44(f). JT Russell nominated David Dove to serve as the panel's only member. In his response, Jim agreed that the Court should appoint a panel but opposed Dove's nomination. (*See* Mot. Appt. Special Litig. Panel, ECF No. 89; Mem. Partial Opp'n, ECF No. 96.)

8. In July 2024, the Court allowed Jim to amend his pleading to renew the derivative counterclaims and add Bob, Raymond, and Tony as counterclaim defendants, all subject to JT Russell's right to move to dismiss those claims later. In addition, the Court granted JT Russell's motion to appoint Dove under section 55-7-44(f), concluding "that Dove is independent and well qualified to investigate Jim

Russell's allegations and to determine whether maintenance of the derivative counterclaims is in JT Russell's best interest." (Order on Mot. Amend, ECF No. 107; Order on Mot. Appt. Special Litig. Panel, ECF No. 108.)

9. Two months later, Dove submitted a report that detailed his inquiry, findings, and conclusions. Independent counsel assisted Dove in conducting the inquiry and preparing the report. As part of his inquiry, Dove reviewed JT Russell's tax returns, audited financial statements, bylaws, minutes of board meetings, and similar documents. He also interviewed Jim, Bob, Raymond, the company's controller (Dave Normand), several former employees identified by Jim, and a few others. It appears to be undisputed that Dove received all the information that he requested and that neither side impeded his inquiry. (*See* Panel Report 1, 8–9, ECF No. 115.1.)

10. In his report, Dove concluded that it would not be in JT Russell's interest to pursue claims against Bob for using its resources to maintain his farm. According to Dove, JT Russell's past and present shareholders were aware of the practice, did not object, and did not expect reimbursement. Plus, there was no evidence of concealment, as Jim had alleged. Dove also found that Bob had conferred many benefits on JT Russell—such as rent-free use of his land—without receiving compensation in return. Considering all these circumstances, Dove concluded that Bob would have strong defenses against any claim and that he might have a claim of his own or setoff rights based on his contributions, thus significantly lowering the probability of a recovery. (*See, e.g.*, Panel Report 15, 17–23, 37.)

11. Dove also concluded that it would not be in JT Russell's interest to pursue claims related to officer perks. In Dove's words, "it was accepted that family members could use company resources for their own benefit." Most, perhaps all, members of the Russell family used company resources to build, heat, and improve their homes for the past thirty years. The practice was not secret, and there was no expectation of payment. Citing "the historical and universal use of resources with no expectation of repayment" as well as "apparent statute of limitations problems," Dove concluded that it would make little sense to maintain claims for these activities. (Panel Report 13–14, 35–36.)

12. Dove reached a similar conclusion as to the allegations of mismanagement. He determined that Bob's "salary and company-provided truck are valid and appropriate expenses" because they are retirement benefits, which JT Russell had customarily provided to other retired family members. According to Dove, "[h]onoring the Company's commitment to Bob was likely done in good faith and consistent with the best interest of the Company," and it would be inequitable to sue when all shareholders had approved these benefits for Bob and others in the family. (Panel Report 33–35.)

13. Although not required to do so, Dove also made inquiry into allegations in Jim's pleading that do not appear in his written demand. These include allegations that Raymond and Tony improperly increased their salaries and made an ill-advised decision to terminate a contract with Mid-Eastern Asphalt. Based on his inquiry, Dove determined that all salary increases were "in line" with the broader construction

industry and that termination of the contract with Mid-Eastern Asphalt benefited JT Russell. (*See, e.g.*, Panel Report 6–7.)

14. Citing Dove's report and recommendation, JT Russell has moved to dismiss Jim's derivative counterclaims under N.C.G.S. § 55-7-44(a). It has also moved to dismiss the direct counterclaim for removal of Raymond and Tony as directors and to strike many of Jim's allegations. (*See* ECF Nos. 119, 121.) The Court held a hearing on 14 January 2025. The motions are fully briefed and ripe for decision.

II.
ANALYSIS

15. These motions present three sets of issues. First, JT Russell contends that Jim's derivative counterclaims must be dismissed because the court-appointed panel determined that it would not be in the company's best interest to maintain the claims and because Jim is not a fair and adequate representative of its corporate interest. Second, JT Russell contends that Jim has not adequately alleged a claim for removal of its directors. Third, JT Russell seeks to strike certain allegations in Jim's pleading.

A. Derivative Counterclaims

16. The Court begins with Jim's derivative counterclaims.

17. By statute, the presiding court "shall dismiss a derivative proceeding on motion of the corporation if" an independent, court-appointed panel "determines in good faith after conducting a reasonable inquiry upon which its conclusions are based that the maintenance of the derivative proceeding is not in the best interest of the corporation." N.C.G.S. § 55-7-44(a); *see also id.* § 55-7-44(f). Factors to consider in deciding the motion include whether the panel is independent, whether it conducted

a reasonable inquiry, and whether it made its decision in good faith. *Madvig v. Gaither*, 461 F. Supp. 2d 398, 404 (W.D.N.C. 2006); *see also* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 17.08 (7th ed. 2024).

18. Here, JT Russell seeks to dismiss Jim's derivative counterclaims based on Dove's determination that maintaining the claims is not in the company's best interest. Jim does not dispute Dove's independence. Rather, he contends that Dove failed to conduct a reasonable, good-faith inquiry. The Court disagrees.

19. Dove's inquiry was more than reasonable. He retained outside counsel to provide advice and assistance throughout the inquiry. He also reviewed a large set of business and financial records that were likely to contain information related to Jim's allegations, including financial statements, historical salary data, and transaction reports related to Bob's farm. Many of these records stretch back to 2005. And he interviewed at least eight witnesses, sometimes more than once. Among the witnesses were at least three former employees of JT Russell identified by Jim as knowledgeable individuals. Following this inquiry, Dove and his counsel produced a thorough, written report. The conclusions in that report are clearly stated and flow logically from the surrounding discussion. Considering all the circumstances, the Court concludes that Dove's inquiry was reasonable and "commensurate in scope with the nature of the issues" that Jim raised. *Madvig*, 461 F. Supp. 2d at 407; *see also Borchardt v. King*, 2015 U.S. Dist. LEXIS 10604, at *30–31 (M.D.N.C. Jan. 29, 2015) (citing panel's reliance on independent counsel and interviews of knowledgeable witnesses as indicia of reasonableness).

20. Likewise, the Court concludes that Dove made his decision in good faith. Dove's independence is unquestioned. No evidence suggests that he conducted his "investigation as a sham or pretext for papering over a predetermined outcome." *Borchardt*, 2015 U.S. Dist. LEXIS 10604, at *36. On the contrary, the thoroughness of the inquiry and the involvement of independent counsel confirm "the spirit and sincerity with which the investigation was conducted." *Id.* at *35 (citation and quotation marks omitted).

21. None of Jim's arguments are compelling. He contends that Dove should have broadened his inquiry by searching e-mails and interviewing more witnesses. This misunderstands Dove's task, which was to perform a reasonable inquiry, not an exhaustive one. Indeed, it is far from clear what purpose would have been served by an exhaustive investigation, given that both sides willingly acknowledged that JT Russell's shareholders routinely used its resources. Moreover, Jim's opposition is conspicuously silent about many of Dove's findings. Dove found, among other things, that Bob conferred considerable benefits on JT Russell without seeking reimbursement, Bob's salary is akin to a retirement benefit and comparable to what was given to other retired family members, salary increases for current officers are in keeping with industry norms, cancellation of the Mid-Eastern Asphalt contract improved JT Russell's financial health, and JT Russell and its shareholders have allowed family members to use company resources for personal reasons for more than

half a century.* Jim offers no basis to question these findings, much less evidence to contradict them.

22. Even so, Jim speculates that a broader inquiry might have revealed evidence that Bob concealed the extent of his use of JT Russell's resources at his farm by attributing it to paying customers' jobs. But Dove explored that allegation, and every witness denied it, including a disinterested witness identified by Jim. (*See, e.g.*, Panel Report 15 ("When asked if he was ever told to charge his time inaccurately or charge his time to the wrong job, his answer was 'never happened.'"), 19 ("To the best of Dave Normand's knowledge, no work done for Bob Russell Farms since 2009 was charged to other jobs.").) Dove's decision not to expand his inquiry in the face of these denials was reasonable. This is especially so given that Jim has not pointed to any witness with a contrary view.

23. Jim also questions the seriousness of Dove's "[h]igh level review" of certain documents. (Panel Report 8–9.) That shows that Dove's inquiry was efficient, not that it was cursory. With counsel's assistance and the benefit of witness interviews, Dove was able to glean material information from voluminous documents without wasting time and resources on irrelevant and immaterial information. In any event,

---

* Jim argues that he now opposes the use of company resources and therefore cannot be deemed to have ratified these activities since his ouster in 2018. Of course, Dove's findings suggest that Jim and the other shareholders ratified or otherwise legitimized many of the disputed transactions (such as paying Bob a salary) long before 2018. Jim does not explain why his change of heart necessitates the revocation of an earlier ratification. Nor has he shown that his dissent, standing alone, is determinative as to post-2018 events, given that he holds just fifteen percent of JT Russell's shares.

Jim has access to these documents. If they contain information that Dove overlooked or misunderstood, Jim could easily make that case. He has not even tried to do so.

24. In addition to challenging the scope of Dove's review, Jim challenges his conclusions. Jim insists that Dove applied a double standard, determining that it was not in JT Russell's interest to pursue claims based on the personal use of its resources even though the company has sued Jim for exactly that sort of activity. Whether JT Russell's claims against Jim are comparable to those that Jim has asserted against Bob, Raymond, and Tony is uncertain. JT Russell plausibly argues that its claims are different in kind due to the scale and nature of the resources supposedly used by Jim, along with other factors. But even if the two sets of claims are alike, Dove applied no double standard. He was tasked only with assessing Jim's claims, not JT Russell's, and therefore said nothing about the advisability of JT Russell's claims against Jim. It also bears noting that Dove's findings concerning JT Russell's permissive culture may make it more difficult for the company to maintain claims against Jim for the use of its resources.

25. Jim goes on to dispute Dove's conclusion that Bob may have setoff rights stemming from JT Russell's rent-free use of his land and similar benefits. Again, it appears to be undisputed that Bob conferred these benefits on the company. Dove's conclusion that Bob may be entitled to claim a setoff of much or all of any potential damages recovery or pursue his own claim for reimbursement is reasonable and based on the evidence. And putting the setoff issue to the side, a company may have good reason not to pursue a claim against a shareholder with whom it has a cordial and

financially beneficial relationship involving reciprocal, informal exchanges of benefits. This, too, reasonably supports Dove's conclusion that it would be inequitable or too costly to pursue claims against Bob, which Dove valued at less than $200,000.

26. As a fallback, Jim urges the Court to defer dismissal so that he can seek discovery. Arguably, there are cases in which it is appropriate to allow the party asserting derivative claims to conduct discovery concerning an appointed panel's independence or the scope of its inquiry. But Jim has not sought discovery along those lines. He seeks, instead, discovery from JT Russell on the merits, which is no reason to delay a decision.

27. In sum, Dove is independent, he performed a reasonable inquiry, and he made his conclusions in good faith. The Court therefore grants JT Russell's motion to dismiss Jim's derivative claims. Having done so, the Court need not and does not address JT Russell's argument that Jim is not a fair and adequate representative of its corporate interest.

## B. Removal of Directors

28. Next, the Court addresses JT Russell's motion to dismiss Jim's claim for removal of Raymond and Tony as directors.

29. A motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604 (1999) (citation and quotation marks omitted). Dismissal is proper when "(1) the complaint on its face reveals that no law supports the . . . claim; (2) the

complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the . . . claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation and quotation marks omitted). In deciding the motion, the Court must treat all well-pleaded allegations as true and view the facts and permissible inferences in the light most favorable to the nonmoving party. *See, e.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019).

30. Shareholders have a narrow statutory right to seek judicial removal of a director. A court may remove a director if the shareholder shows that "[t]he director engaged in fraudulent or dishonest conduct, or gross abuse of authority or discretion, with respect to the corporation" and "[r]emoval is in the best interest of the corporation." N.C.G.S. § 55-8-09(a). Although few North Carolina cases have interpreted and applied this statute, other jurisdictions with similar statutes have made clear that "judicial removal of a director is an extraordinary remedy." *Neiman v. Tri R Angus, Inc.*, 739 N.W.2d 182, 189 (Neb. 2007). The statute "is not intended to permit judicial resolution of internal corporate struggles for control except in those cases in which a court finds that the director has been guilty of wrongful conduct of the type described." *Mauck v. Cherry Oil Co.*, 2022 NCBC LEXIS 39, at *22 (N.C. Super. Ct. May 2, 2022) (citation and quotation marks omitted).

31. Jim alleges that Raymond and Tony took control of JT Russell unlawfully. As alleged, Raymond and Tony pushed through an invalid amendment of JT Russell's bylaws. This, in turn, allowed them to oust Jim and to stack the company's board

with loyalists, violating the original, unamended bylaws. (*See* Am. Countercls. ¶¶ 32, 34, 39, 40, 41.) These allegations show more than a mere struggle for control. Taken as true, the allegations of dishonest acts and unlawful circumvention of the bylaws to gain corporate control are sufficient to state a claim. *See, e.g.*, *Taylor v. Hinkle*, 360 Ark. 121, 139 (2004) (concluding that directors' "retaliatory" actions and "blatant violations of the franchise agreement, coupled with their clear intentions to commit other actions designed to wrest control away," were sufficient to show gross abuse of discretion); *see also Boatright v. A&H Techs., Inc.*, 296 So.3d 687, 698 (Miss. 2020) (concluding that director's "attempt to freeze . . . out" another shareholder met the statutory standard but that removal was not in the company's best interest).

32.     Jim has also alleged self-dealing: that Raymond and Tony gave themselves and their families perks, allowed Bob to use JT Russell's resources for his farm, and improperly hid Bob's uses of resources under jobs for paying customers. (*See, e.g.*, Am. Countercls. ¶¶ 47–49, 68, 72.) JT Russell argues that Dove's report forecloses these allegations. It does not. The standard of review that applies under Rule 12(b)(6) differs from the standard that applies to a motion to dismiss derivative claims under section 55-7-44(a). For purposes of Rule 12(b)(6), the Court is limited to the four corners of Jim's pleading. Because Dove's report is "evidence outside the pleadings," it "cannot be considered in determining whether the [counterclaim] complaint states a claim on which relief can be granted." *Jackson/Hill Aviation, Inc. v. Town of Ocean Isle Beach*, 251 N.C. App. 771, 775 (2017). It seems likely that Jim will have to address the effect of Dove's findings at a later stage. For now, his

allegations of self-dealing and concealment, when viewed in connection with his allegations of unlawful seizure of control, further support the conclusion that he has adequately stated a claim for relief.

33. Accordingly, the Court denies the motion to dismiss this claim.

## C. Motion to Strike

34. A trial court "may order stricken from any pleading any insufficient defense or any redundant, irrelevant, immaterial, impertinent, or scandalous matter." N.C. R. Civ. P. 12(f). Motions to strike "are viewed with disfavor and are infrequently granted." *Daily v. Mann Media, Inc.,* 95 N.C. App. 746, 748–49 (1989). "Matter should not be stricken unless it has no possible bearing upon the litigation. If there is any question as to whether an issue may arise, the motion should be denied." *Shellhorn v. Brad Ragan, Inc.*, 38 N.C. App. 310, 316 (1978).

35. JT Russell asks to strike over eighty paragraphs from Jim's pleading. Its contention is that these paragraphs would be irrelevant if the Court were to dismiss Jim's derivative counterclaims and claim for removal of directors. The Court has not dismissed the claim for removal of directors, and in any event, these paragraphs appear to relate to Jim's claim for judicial dissolution. Because JT Russell has not shown that these allegations have no possible bearing upon the litigation, its motion to strike is denied.

### III.
### CONCLUSION

36. For these reasons, the Court **GRANTS** JT Russell's motion to dismiss Jim's derivative counterclaims and **DISMISSES** them with prejudice, **DENIES** JT

Russell's motion to dismiss Jim's claim for removal of directors, and **DENIES** JT

Russell's motion to strike.

      **SO ORDERED**, this the 4th day of March, 2025.


                /s/ Adam M. Conrad
               Adam M. Conrad
               Special Superior Court Judge
                for Complex Business Cases